UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNIVERSAL STABILIZATION TECHNOLOGIES, INC.,<br><br>  Plaintiff,<br><br>v.<br><br>ADVANCED BIONUTRITION CORP.,<br><br>  Defendant. | Case No.: 17cv87-GPC(MDD)<br><br>**ORDER CONSTRUING DISPUTED CLAIM TERMS OF U.S. PATENT NO. 8,097,245** |

In this correction of inventorship action, the parties seek construction of disputed claim terms found in U.S. Patent No. 8,097,245. The parties filed opening claim construction briefs, (Dkt. Nos. 38, 41), and responsive briefs. (Dkt. Nos. 42, 43.) A claim construction hearing was held on November 9, 2017. Based on the parties' brief, oral argument and the applicable law, the Court construes the terms as set forth below.

**Background**

Plaintiff Universal Stabilization Technologies, Inc. ("Plaintiff" or "UST") filed a complaint against Defendant Advanced Bionutrition Corporation ("Defendant" or "ABN") for correction of inventorship of U.S. Patent No. 8,907,245 ("'245 patent") pursuant to 35 U.S.C. § 256, unjust enrichment, declaratory relief, and constructive trust and accounting. (Dkt. No. 1, Compl.)

Dr. Victor Bronshtein ("Dr. Bronshtein"), founder and President of UST, "is a world renowned and recognized expert in the field of preserving biologics including biomacromolecules, bacteria, viruses, and mammalian cells from damage during cryopreservation and preservation in a dry state." (Id. ¶ 2.) Defendant ABN is designated as the sole owner of the '245 patent at the U.S. Patent & Trademark Office. (Id. ¶ 3.)

According to the complaint, in 2004, ABN hired UST to assist and disclose information to it related to a project concerning the preservation of probiotic bacteria. (Id. ¶ 7.) Dr. Bronshtein met with ABN and disclosed, in confidence, UST's previously developed know-how that became the claimed subject matter of the '254 patent. (Id.) On January 17, 2012, the '245 patent, concerning the "subject matter of preserving probiotic material," issued and identified Mordechi Harei and Keren Kohavi-Beck as the alleged inventors of the compositions and the processes claimed in the '245 patent. (Id. ¶ 8.) The complaint alleges that Dr. Bronshtein is the inventor of the claimed processes of the '245 patent and the subject matter of the '245 patent reflects inventions known and conceived by him and disclosed by him to ABN. (Id. ¶ 9.) The complaint claims that Dr. Bronshtein was incorrectly not named as the sole inventor of the claimed subject matter of the '245 patent, or in the alternative, incorrectly not named as a co-inventor of the subject matter of the '245 patent. (Id. ¶ 13.)

## Discussion

### A. Legal Standard

Due to the presumption that patents are presumed valid under 35 U.S.C. § 282, it follows that there is a presumption that the named inventors on a patent are the true and only inventors. Gemstar-TV Guide Int'l Inc. v. Int'l Trade Comm'n, 383 F.3d 1352, 1381 (Fed. Cir. 2004). If there is more than one inventor, all inventors must jointly apply for a patent even if they did not work together, physically or at the same time. Id. (citing 35 U.S.C. § 116). "Because co-inventors need not contribute to the subject matter of every claim of the patent, inventorship is determined on a claim-by-claim basis." Id.

Therefore, similar to an infringement or invalidity analysis, to determine inventorship, it first requires the construction of each disputed claim to determine the subject matter encompassed. Id. at 1381-82.

Claim construction is a question of law to be determined by the court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 384 (1996). Generally, claim language is given its "ordinary and customary meaning," defined as "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*) (citations omitted). In cases where the "ordinary and customary meaning" is clear, claim construction involves "little more than the application of the widely accepted meaning of commonly understood words." Id. at 1314.

If the ordinary meaning of a claim language is not readily apparent, it "is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record. . . ." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). Intrinsic evidence includes the language of the claim, the patent specification, and the prosecution history. Biogen Idec, Inc. v. GlaxoSmithKline LLC, 713 F.3d 1090, 1094 (Fed. Cir. 2013) ("a term's ordinary meaning must be considered in the context of all the intrinsic evidence, including the claims, specification, and prosecution history.")

In construing a claim, the court first looks to the language of the claims. Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004). Then, a court must also look at the specification which is "'always highly relevant'" and "'[u]sually [] dispositive; it is the single best guide to the meaning of a disputed term.'" Phillips, 415 F.3d at 1315 (quoting Vitronics Corp., 90 F.3d at 1582). Where the inventor gives a term a special meaning, "the inventor's lexicography governs." Id. at 1316. Where the inventor specifically disclaims a certain scope in the specification, that disclaimer is similarly dispositive. Id. Lastly, the court may also look at the patent's prosecution history, when it is admitted into evidence, which includes the

complete record of proceedings before the USPTO, as well as cited prior art references. Id. at 1317.

If the intrinsic evidence does not resolve any ambiguity in the claim dispute, the Court may consider extrinsic evidence such as "expert, inventor testimony, dictionaries, and technical treatises and articles." Vitronics Corp., 90 F.3d at 1584. However, extrinsic evidence is "less significant than the intrinsic record" and "less reliable than the patent and its prosecution history in determining how to read claim terms." Phillips, 415 F.3d at 1317-18 (internal quotation marks and citation omitted).

## Discussion

The '245 patent is entitled "Delivery Vehicle for Probiotic Bacteria Comprising a Dry Matrix of Polysaccharides, Saccharides and Polyols in a Glass Form and Methods of Making Same." (Dkt. No. 41-1, Ex. A at 15[1].) The patent was issued on January 17, 2012. Claim 1 of the '245 patent provides,

> A process for producing a glass matrix comprising a probiotic bacteria, the process comprising:
>
> a) dispersing under heating conditions at least one polysaccharide in water;
>
> b) adding trehalose, a sugar alcohol and a probiotic bacteria to the dispersed polysaccharide to form a slurry, wherein the ratio of trehalose to sugar alcohol is 3:1 to 1:3 and wherein the sugar alcohol is selected from a group consisting of mannitol, glycerol, sorbitol, xylitol, maltitol, lactitol and isomalt;
>
> c) contacting the slurry with a bath comprising Ca++ ions for a sufficient time to allow cross-linking thereby forming a gel matrix;
>
> d) harvesting the gel matrix and placing the harvested gel matrix in a drier wherein the temperature of the harvested gel matrix is maintained above the freezing temperature of water;
>
> e) reducing the pressure during **a first drying stage** and maintaining **the**

---

[1] Page numbers are based on the CM/ECF pagination.

**temperature** at about 10-20° C. for a first period of time; and

f) further reducing the pressure during **a second drying stage** and increasing **the temperature** to between about 40-50° C. for a second period of time to produce the glass matrix comprising the probiotic bacteria.

(Id. at 21.)

The parties dispute the construction of the phrases, "a first drying stage" and "a second drying stage".

**A.    "a first drying stage" and "a second drying stage"**

| ABN's Construction | UST's Construction |
|---|---|
| "A first stage to reduce the moisture content of the gel matrix without any foam formation"<br><br>"A second stage to reduce the moisture content of the gel matrix without any foam formation" | Plain and ordinary meaning |

ABN argues that one of ordinary skill in the art would construe the phrases "a first drying stage" and "a second drying stage" to mean "to reduce the moisture content of the gel matrix without any foam formation." UST contends that ABN's proposed construction of the two claims violate the canons of claim construction asking the Court to improperly read limitations from the specifications into the claims. It argues that ABN could have easily included these limitations when it initially drafted the claims but it did not.

**1.    Claim Language**

The claim language does not define the phrase "a first drying stage" or "a second drying stage." ABN asserts that it is noteworthy that the two drying stages are applied to a "gel matrix." (Dkt. No. 41 at 13.) The Court concludes that the claim language, itself, does not provide any guidance as to the construction of the two phrases.

5

## 2. Specification

ABN argues that the specification in the '245 patent is replete with statements that define the drying stages as occurring in the absence of foam formation and clearly and unambiguously indicate that lack of foam formation is a key element of the '245 invention. UST maintains, without providing legal authority, that there is no clear evidence of the inventors' disavowal of the claim scope because the patent contains multiple embodiments and the specification statements relied upon by ABN do not unambiguously apply to all embodiments. Lastly, looking to extrinsic evidence, UST provides the declaration of Dr. Bronshtein, who is one skilled in the art, stating that construing the drying stage to mean "without any foam formation" is not physically possible under the claims' conditions of reduced pressure and the temperature of the gel matrix as it would necessarily lead to foaming.

"The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." Thorner v. Sony Computer Entm't America LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing Phillips, 415 F.3d at 1313). There are two exceptions to this general rule: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." Id. (citing Vitronics Corp., 90 F.3d at 1580); Pacing Techs., LLC v. Garmin Int'l, Inc., 778 F.3d 1021, 1024 (Fed. Cir. 2015) (The "specification and prosecution history compel departure from the plain meaning in only two instances: lexicography and disavowal."). "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1341 (Fed. Cir. 2001); Trustees of Columbia Univ. in City of N.Y. v. Symantec Corp., 811 F.3d 1359, 1364 (Fed. Cir. 2016) (quoting Phillips, 415 F.3d at

1320-21) ("a claim term may be clearly redefined without an explicit statement of redefinition" and "[e]ven when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents.").

Here, there is no indication or argument that the patentees acted as their own lexicographers; instead, the parties dispute whether the inventors disavowed the full scope of the claim term in the specification.

The standard for disavowal of claim scope is "exacting" and an exclusion or restriction must be "clear and unmistakable." Thorner, 669 F.3d at 1366. It must demonstrate an intent to deviate from the "ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." Id. at 1366. However, it need not be explicit. Poly-America, L.P. v. API Indus., Inc., 839 F.3d 1131, 1136 (9th Cir. 2016). "Mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal." Thorner, 669 F.3d at 1366.

"[A]n inventor may disavow claims lacking a particular feature when the specification distinguishes or disparages prior art based on the absence of that feature." Poly-America, L.P., 839 F.3d at 1136. "Where the general summary or description of the invention describes a feature of the invention . . . and criticizes other products . . . that lack that same feature, this operates as a clear disavowal . . . .'" Edwards Lifesciences LLC v. Cook Inc., 582 F.3d 1322, 1333 (Fed. Cir. 2009) (quoting Astrazeneca AB v. Mut. Pharm. Co., 384 F.3d 1333, 1340 (Fed. Cir. 2004)).

Here, the '245 patent describes a process of creating a solid glass matrix, consisting of polysaccharides, saccharides and polyols as a delivery vehicle for preserving probiotic bacteria. (Dkt. No. 41-1, Blaszowski Decl., Ex. A, '245 Patent.) The Background discusses the prior different methods of maintaining the long term viability of probiotic bacteria. (Id., at col. 1-2.) It notes that prior to the '245 patent, no one had provided a cost effective solution to the problems of maintaining viability of

bacterial cells at ambient temperatures and high water activities, and providing gastric protection to minimize losses of probiotic viability during the transit through the stomach. (Id., col. 3:29-35.) The Background addresses a method of bacterial preservation, developed by Dr. Bronshtein, that uses the "foam formation technique" which includes the "addition of foam forming elements and stabilizers." (Id., col. 2:40-48.) It notes that the foam-preserved bacteria are not protected from gastric excursion and that the material is very sensitive to humidity and takes up water readily which decreases the viability of the bacteria. (Id., col. 2:48-57.) It also commented that the foam formation technique is difficult and costly because foam requires large volumes of space under reduced pressure and produces very little mass. (Id., col. 2:50-56.) Finally, it states, "[a]dditionally, the disclosed composition and method of drying results in a higher loading capacity of product as compared to the foam drying method, that permits only a thin layer of solution to foam and dry efficiently." (Id., col. 8:35-38.) The specification distinguishes the foam formation technique developed by Dr. Bronshtein, and in fact, disparages its use as ineffective in long-term viability of the probiotic bacteria, and is also "difficult and costly." (Id., col. 2:48-56.) Specifically, Dr. Bronshtein's foam formation technique fails to protect the probiotic bacteria from gastric incursion and humidity. The Background concludes that "the present invention overcomes these problems." (Id., at col. 3:36.) These statements of disparagement of prior art and distinguishing the current invention express a clear disavowal of the foam formation technique.

Next, an inventor may also disavow claims when the specification describes "the present invention" as having that feature. Poly-America, LP, 839 F.3d at 1136; Honeywell Int'l, Inc., 452 F.3d at 1318 ("On at least four occasions, the written description refers to the fuel filter as "this invention" or "the present invention"); SciMed Life Sys., 242 F.3d at 1343 ("the characterization of the coaxial configuration as part of the 'present invention' is strong evidence that the claims should not be read to encompass the opposite structure."). Phrases such as "the present invention includes . . . ." or "the

present invention is . . ." or "all embodiments of the present invention are . . ." indicate disavowal or disclaimer that is clear and unmistakable. GE Lighting Solutions, LLC v. AgiLight, Inc., 750 F.3d 1304, 1309 (Fed. Cir. 2014).

"When a patentee describes the features of the present invention as a whole, he alerts the reader that this description limits the scope of the invention." Pacing Techs., LLC, 778 F.3d at 1025 (internal quotation marks omitted)); Netcraft Corp. v. eBay, Inc., 549 F.3d 1394, 1398 (Fed. Cir. 2008) (holding that language describing "present invention," when read in light of the specification and prosecution history, described entire invention and therefore had to be reflected in claim construction); see also InfoGation Corp. v. ZTE Corp., Case No. 16cv1901-H-JLB, 2017 WL 1821402, at *6 (S.D. Cal. May 5, 2017) (by using the phrase "the present invention," "the specification is describing the invention as a whole, not merely a preferred embodiment"); B-K Lighting, Inc. v. Vision 3 Lighting, No. CV 06-2825 MMM(PLAx), 2008 WL 4811176, at 24 (C.D. Cal. Mar. 13, 2008).

In SciMed, the patentee described two different types of catheters in the prior art, those with dual lumens (side-by-side) and those with coaxial lumens. 242 F.3d at 1339. The court held that clear disavowal was collectively demonstrated against including dual lumens when the patentee, in discussing prior art, disparaged the dual lumen configuration as larger than necessary and less pliable than the coaxial type, id. at 1342; the specification repeatedly described the "present invention" as a coaxial design, id.; and the specification stated: "[t]he intermediate sleeve structure defined above [coaxial design] is the basic sleeve structure for *all embodiments* of the present invention contemplated and disclosed herein." Id. at 1343 (emphasis in original).

Here, the '245 specification states, *"[t]he present invention* also provides methods of vacuum drying the preservation matrix without foaming or ice formation." (Dkt. No. 41-1, Blaszkowski Decl., Ex. A, '245 Patent at col. 4:56-58 (emphasis added).) The specification further explains,

> *The present invention* also provides methods of drying the mixture in glass

> form with a minimum loss of viability. It was discovered that vitrifying and efficient drying of the preservation mixture under vacuum was possible without the need of foam formation as described by Bronshtein (2004). Gelling or cross-linking the polysaccharides in the preservation mixture and slicing it to small pieces eliminated the need to foam the mixture in order to dry it under vacuum. It also reduced the formation of a rubbery product which happened often in the foaming process.

(Dkt. No. 41-1, Blaszkowski Decl., Ex. A, '245 Patent, col. 4:37-46 (emphasis added). Finally, the specification states, "[i]n accordance *with the present invention*, the large surface area of the sliced and chopped gel or strings greatly increases evaporation rate without the need to boil or foam the product, thus eliminating inconsistent drying conditions and splattering of the foaming product solution in the vacuum chamber." (Id., at col. 8:30-35 (emphasis added).)

These "present invention" statements in the '245 patent's specification that drying involves the absence of foaming are strong indications that the first and second drying stage involve reducing the moisture without any foam formation. See SciMed Life Sys., 242 F.3d at 1343. This process applies to either the process of adding foam forming elements or the absence of foam forming during the drying process. (Dkt. No. 41-1, Blaszkowski Decl., Ex. A, '245 Patent, col. 4:37-46; 56-58.) Disparaging and distinguishing Bronshtein's prior method of foam formation and the use of the phrase "the present invention" to describe the drying process in the absence of any foam make it clear and unmistakable that the statements in the specification disclaim or disavow the broader claim scope of "a first drying stage" and "a second drying stage" to one without foam formation.

UST asserts, without providing any legal authority, that the specification statements relied upon by ABN is a statement of desired result for certain embodiments and include two desired aspects of "without foaming or ice formation" but ABN's proposed construction only includes "foaming" and not "ice formation." The Court notes that the specification's disparagement of the Dr. Bronhstein's prior art addressed only the

foam formation technique, not ice formation. Furthermore, UST does not provide any legal authority that ABN's construction of the drying stages must necessarily also include ice formation.

UST also argues that there is no clear evidence of the inventors' disavowal of the claim scope because the patent contains multiple embodiments and the specification statements relied upon by ABN do not unambiguously apply to all embodiments. While claims are generally construed to encompass the preferred embodiments as provided in the specification, see On-Line Tech. v. Bodenseewerk Perkin-Elmer, 386 F.3d 1133, 1138 (Fed. Cir. 2004), UST does not provide any authority that the claims must encompass all embodiments, and is not supported.

Finally, at oral argument, UST argued that independent claim 1 cannot involve a drying process without foam formation because dependent claim 7, "wherein the gel matrix . . . is sliced to form threads before placement in the drier" must necessarily be a limitation in claim 1. Therefore, under claim differentiation, since each claim is different in scope, the slicing to form threads, a requirement for the foamless technique, cannot be read into independent claim 1. In response, ABN contends that claim differentiation does not apply here because the specification, as a whole, requires an interpretation which would deviate from a construction arising from claim differentiation.

Under claim differentiation, "each claim in a patent is presumptively different in scope." Wenger Mfg., Inc. v. Coating Machinery Sys., Inc., 239 F.3d 1225, 1233 (Fed. Cir. 2001). "'[C]laim differentiation' refers to the presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim." Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1380 (Fed. Cir. 2006). However, the presumption is a rebuttable one that may be "overcome by a contrary construction dictated by the written description or prosecution history." Howmedica Osteonics Corp. v. Zimmer, Inc., 822 F.3d 1312, 1323 (Fed. Cir. 2016); GE Lighting Solutions, LLC v AgiLight, Inc., 750 F.3d 1304, 1310 (Fed. Cir. 2014) (the presumption can be overcome by a "contrary construction required by the specification or production

history, such as via a disclaimer."). Claim differentiation may be helpful in some cases, but it is just one of many tools used by courts in the analysis of claim terms. ERBE Elektromedizin GmbH v. Canady Tech. LLC, 629 F.3d 1278, 1286 (Fed. Cir. 2010); Howmedica Osteonics Corp., 822 F.3d at 1323 (claim differentiation is a guide and not a rigid rule). Although claim differentiation is a useful analytic tool, it cannot enlarge the meaning of a claim beyond that which is supported by the patent documents, or relieve any claim of limitations imposed by the prosecution history. Fenner Inv., Ltd. v. Cellco P'ship, 778 F.3d 1320, 1327 (Fed. Cir. 2015). The "written description and prosecution history overcome any presumption arising from the doctrine of claim differentiation." Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1370 (Fed. Cir. 2007). The Federal Circuit has acknowledged that surplusage may exist in some claims and ultimately, construction of claim terms must be "understood in terms of the factual situations that produced them, and applied in fidelity to their origins." ERBE, 629 F.3d at 1286.

In Retractable Techs., the Federal Circuit held that claim differentiation was rebutted by statements in the specification that referenced a one piece body syringe. 653 F.3d 1296, 1305 (Fed. Cir. 2011). The patent contained an independent claim referring to a "body" and a dependent claim that limited the "body" to a "one-piece body." Id. Prior art syringes had failed to recognize a one piece body syringe, and the specification stated that each embodiment contained a one-piece body. Id.; see also Kraft Foods, Inc. v. Int'l Trading Co., 203 F.3d 1362, 1367 (Fed. Cir. 2000) (claim differentiation presumption was overcome by the written description and the prosecution history).

According to the specification, the without foam formation process requires the "[g]elling or cross-linking of the polysaccharides in the preservation mixture," and "slicing it to small pieces." (Dkt. No. 41-1, Blaszkowki Decl., Ex. A, '245 Patent, col. 4:41-43; see also '245 Patent, col. 4:46-49; col. 6:48-55; col. 8:30-35.) The cross-linking of the polysaccharides is asserted in independent claim 1c; however, slicing the gel matrix into small pieces is asserted in dependent claim 7. While dependent claim 7

12

addresses the slicing of the gel matrix which is an attribute of the drying process without foam formation and not a limitation ABN seeks to include in independent claim 1, the parties do not address whether claim differentiation applies to an attribute of a dependent claim. However, even if claim differentiation applies, the specification clearly reveals the '245 patent involves a drying process without foam formation, and thus, rebuts any presumption arising from claim differentiation.

### 3. Prosecution History

Although ABN, in its facts, cites to the patent examiner's statements in the notice of allowance, no arguments are presented concerning the prosecution history.

### 4. Extrinsic Evidence

Plaintiff provides the declaration of the alleged inventor, Dr. Bronshtein, stating that the physical parameters of the drying process in the '245 patent will necessarily lead to boiling and foaming. (Dkt. No. 43-1, Bronshtein Decl.) Therefore, one skilled in the art would understand that ""without foaming" cannot apply to the claims in the '245 patent as it is physically impossible.

The court may rely on extrinsic evidence only if the intrinsic evidence does not resolve any ambiguity in the dispute claim. Vitronics, 90 F.3d at 1583 (citing Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1216 (Fed. Cir. 1995) ("In construing the claims we look to the language of the claims, the specification, and the prosecution history. Extrinsic evidence may also be considered, if needed to assist in determining the meaning or scope of technical terms in the claims.")). "Extrinsic evidence may not be used to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'" Summit 6, LLC v. Samsung Elecs. Co., 802 F.3d 1283, 1290 (Fed. Cir. 2015); see also Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc., 262 F.3d 1258, 1269 (Fed. Cir. 2001) ("[E]xtrinsic evidence . . . may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history.").

Extrinsic evidence is less reliable and less significant than intrinsic evidence in assessing the legal operative meaning of a claim. Phillips, 415 F.3d at 1317-18. "In sum, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." Id. Moreover, an inventor's testimony is given little or no weight in claim construction. Solomon v. Kimberly-Clark Corp., 216 F.3d 1372, 1379 (Fed. Cir. 2000) (inappropriate to consider "litigation-derived inventor testimony" as it is entitled to "little, if any, probative value."); Bell & Howell Document Mgmt. v. Altek Sys., 132 F.3d 701, 706 (Fed. Cir. 1997) ("The testimony of an inventor is often a self-serving, after-the-fact attempt to state what should have been part of his or her patent application . . . .") (citing Markman, 52 F.3d at 983).

Here, as discussed above, the specification is not ambiguous and resolves the construction of "the first drying stage" and "the second drying stage"; therefore, reliance on extrinsic evidence is not appropriate. Moreover, a declaration from the alleged inventor is also given little weight. See Bell, 132 F.3d at 706. The Court declines to consider Dr. Bronshtein's declaration.

Accordingly, the Court construes "a first drying stage" as "a first stage to reduce the moisture content of the gel matrix without any foam formation" and "a second drying stage" to mean "a second stage to reduce the moisture content of the gel matrix without any foam formation."

**B.    "the temperature"**

ABN argues that one of ordinary skill in the art would understand the term "the temperature" according to its plain and ordinary meaning refers to the "the temperature of the gel matrix." UST does not present its own construction and does not address "the temperature" claim in its briefs or at oral argument. Accordingly, the Court construes "the temperature" as proposed by ABN, as "the temperature of the gel matrix."

////

////

### C. Polysaccharides

Lastly, ABN asks the Court to construe the term "polysaccharide" pursuant to the definition provided in the '245 patent and as agreed upon by the parties.

> "Polysaccharides" refers to compounds consisting of a large number of monosaccharides linked with glycosidic bonds. As used herein, the term polysaccharides refers only to those containing more than ten monosaccharide residues.

(Dkt. No. 41-1, Blaszkowski Decl., '235 Patent, Ex. A, col. 5:57-60 at 17.) Based on the parties' agreement, the Court construes polysaccharides based on the definition provided in the '245 patent.

### Conclusion

For the reasons stated above, the terms at issue shall be construed as indicated above.

IT IS SO ORDERED.

Dated: April 3, 2018

Hon. Gonzalo P. Curiel
United States District Judge