UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNIVERSAL STABILIZATION TECHNOLOGIES, INC.,<br><br>                      Plaintiff,<br><br>v.<br><br>ADVANCED BIONUTRITION CORP.,<br>                      Defendant. | Case No.: 17cv87-GPC(MDD)<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>**[REDACTED-ORIGINAL FILED UNDER SEAL]**<br><br>**[Dkt. Nos. 63, 72.]** |

Before the Court are Defendant's motion for summary judgment and Plaintiff's cross-motion for summary judgment. (Dkt. Nos. 63, 72.) Opposition briefs were filed. (Dkt. Nos. 72, 81.) Replies were also filed. (Dkt. Nos. 81, 90.) A hearing was held on August 17, 2018. (Dkt. No. 96.) Trevor Coddington, Esq. appeared on behalf of Plaintiff and Christopher Blaszkowski, Esq. and Benjamin Leace, Esq. appeared on behalf of Defendant. After a careful review of the briefs, the supporting documentation, the applicable law, and hearing oral argument, the Court GRANTS Defendant's motion for summary judgment and DENIES Plaintiff's motion for summary judgment.

/ / / /

/ / / /

Plaintiff Universal Stabilization Technologies, Inc. ("Plaintiff" or "UST") filed a complaint against Defendant Advanced Bionutrition Corporation ("Defendant" or "ABN") for correction of inventorship of U.S. Patent No. 8,907,245 ("'245 patent") pursuant to 35 U.S.C. § 256, unjust enrichment, declaratory relief, and constructive trust and accounting. (Dkt. No. 1, Compl.) The '245 patent is entitled "Delivery Vehicle for Probiotic Bacteria Comprising a Dry Matrix of Polysaccharides, Saccharides and Polyols in a Glass Form and Methods of Making Same." (Dkt. No. 1-2, Ex. 1 at 2[1].) Defendant ABN is listed as the assignee and Mordechi Harel and Keren Kohavi-Beck are named as the inventors of the '245 patent. (Id.)

ABN's technologies relate to numerous industries and include human and animal nutrition and health. (Dkt. No. 12-4, Harel Decl. ¶ 2.) It has developed technology relating to the delivery of probiotic bacteria and some of this technology is claimed in the '245 patent. (Id. ¶¶ 3,4.)

As of 2002, Dr. Mordechi Harel ("Dr. Harel") and Ms. Keren Kohavi-Beck ("Ms. Kohavi-Beck") had been working on "stabilization technologies" or process to improve the shelf stability of ABN's probiotic delivery vehicle. (Dkt. No. 63-4, Blaszkowski Decl., Ex. A, Dr. Harel Depo. at 14:16-21; Dkt. No. 63-2, D's SMUF No. 3.) Dr. David Kyle, ABN's CEO at the time, was previously acquainted with Dr. Victor Bronshtein ("Dr. Bronshtein"), the founder of UST, and hoped that in a "parallel program," he could "accelerate" ABN's development of this shelf-stable process. (Dkt. No. 63-5, Blaszkowski Decl., Ex. B, Kirk Depo. at 18:9-14.)

On June 1, 2004, ABN hired Dr. Bronshtein and UST as a consultant pursuant to a Consulting Development Agreement ("CDA") related to ABN's previously developed probiotic technology. (Dkt. No. 63-6, Blaszkowki Decl., Ex. C, CDA.) The CDA

---

[1] Page numbers are based on the CM/ECF pagination.

"provides the framework for application of UST's and ABNC technological knowledge to joint development of ambient and elevated temperature stable probiotic bacteria formulations and products to be delivered in the gut using ABNC technology for application as nutrition and disease control ingredients for aquaculture and agriculture feeds, human foods, and dietary supplements." (Id., CDA ¶ 1) In addition, "UST agrees to use its best efforts to understand, improve, and advance ABNC technology that has been developed to enrobe and protect active biologics as well as increase the stability of biologics to processing and storage." (Id.)

Under the CDA, the parties recognized that Dr. Bronshtein has certain "know-how . . . relating to preservation technology, including but not limited to formulations and processes for stabilizing materials in the dry state at temperatures and humidities that are higher than currently possible thus improving survival rates of biological materials." (Id., CDA at 2.) ABN's technology is described as a "novel formulation platform . . . that allows for the delivery of probiotics into the gut . . . ." (Id., CDA at 2.) ABN "desires to obtain the benefits of UST's expertise and knowledge to identify and develop formulation approaches designed to improve the stability of biologics processed using ABNC technology." (Id.) Dr. Bronshtein and UST additionally acknowledged that ABN's technology "allows for the delivery of probiotics into the gut, by protecting damage of the bacteria in the stomach. One embodiment of the technology is achieved by encapsulating probiotics in a high amylose starch and phospholipids mixture, held together by cross linked alginate." (Id.)

Over the course of two and a half years, ABN paid UST over $270,000, (Dkt. No. 63-8, Blaszkowski Decl., Ex. E, Bronshtein Depo. at 67:2-13), with the expectation that Dr. Bronshtein would advance ABN's technology but according to ABN, Dr. Bronshtein did not contribute to ABN's work. (Dkt. No. 63-5, Blaszkowski Decl., Ex. B., Kirk Depo. at 17:15-20.) Due to his work with ABN, Plaintiff claims Dr. Bronshtein is either the inventor or a co-inventor of the '245 patent.

Defendant moves for summary judgment claiming that Dr. Bronshtein is not the inventor or co-inventor of the '245 patent and that UST is not entitled to unjust enrichment. Plaintiff opposes Defendant's motion and also moves for summary judgment that Dr. Bronshtein is the inventor, or at least the co-inventor, of the '245 patent and it is entitled to unjust enrichment.

## Discussion

### A.     Legal Standard on Summary Judgment

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 327 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. Celotex Corp., 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. Id. at 322-23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an

element of its case, the moving party is entitled to judgment as a matter of law. Id. at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. Anderson, 477 U.S. at 255.

**B.    Correction of Inventorship**

Under 35 U.S.C. § 256, an alleged patentee may seek to correct inventorship. Because the named inventors on an issued patent are presumed to be the true and only inventors, Gemstar-TV Guide Int'l Inc. v. Int'l Trade Comm'n, 383 F.3d 1352, 1381 (Fed. Cir. 2004), correction of inventorship requires clear and convincing evidence of a misjoinder or nonjoinder of inventors. Hess v. Advanced Cardiovascular Sys., Inc., 106 F.3d 976, 980 (Fed. Cir. 1997). This burden is a heavy one. Id.

"To meet the burden of clear and convincing evidence, the alleged co-inventors must prove their contribution to the conception of the invention with more than their own testimony concerning the relevant facts." Trovan, Ltd. v. Sokymat SA, Irori, 299 F.3d 1292, 1302 (Fed. Cir. 2002) (citing Price v. Symsek, 988 F.2d 1187, 1194 (Fed. Cir. 1993)). "[A]n inventor's testimony, standing alone, is insufficient to prove conception-some form of corroboration must be shown." Price, 988 F.2d at 1194. Whether the co-inventor's testimony has been sufficiently corroborated is evaluated under a "rule of reason analysis," which requires an "evaluation of all pertinent evidence . . . so that a sound determination of the credibility of the inventor's story may be reached." Price, 988 F.2d at 1195. Under the rule of reason, the evidence "must be considered as a whole, not individually." Price, 988 F.2d at 1196. Reliable corroboration preferably comes in the form of records made contemporaneously with the inventive process. Sandt Tech., Ltd. v. Resco Metal & Plastics Corp., 264 F.3d 1344, 1350-51 (Fed. Cir. 2001).

5

Circumstantial evidence of an independent nature may also corroborate. <u>Trovan</u>, 299 F.3d at 1303. Additionally, "oral testimony from someone other than the alleged inventor may corroborate." <u>Id.</u> "Summary judgment is properly granted if the evidence, when viewed in a light most favorable to the non-moving party, fails to establish the inventorship of an omitted inventor by clear and convincing evidence." <u>Linear Tech. Corp. v. Impala Linear Corp.</u>, 379 F.3d 1311, 1327 (Fed. Cir. 2004).

Furthermore, "[c]onception is the touchstone of inventorship." <u>Ethicon, Inc. v. U.S. Surgical Corp.</u>, 135 F.3d 1456, 1460 (Fed. Cir. 1998) (citation and internal quotation marks omitted). "Conception is complete when one of ordinary skill in the art could construct the apparatus without unduly extensive research or experimentation." <u>Sewall v. Walters</u>, 21 F.3d 411, 415 (Fed. Cir. 1994) (citation omitted). "Beyond conception, a purported inventor must show that he made 'a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention . . . .'" <u>Acromed Corp. v. Sofamor Danek Group, Inc.</u>, 253 F.3d 1371, 1379 (9th Cir. 2001) (quoting <u>Pannu v. Iolab Corp.</u>, 155 F.3d 1344, 1351 (Fed. Cir. 1998)). "An inventor 'may use the services, ideas and aid of others in the process of perfecting his invention without losing his right to a patent.'" <u>Shatterproof Glass Corp. v. Libbey-Owens Ford Co.</u>, 758 F.2d 613, 624 (Fed. Cir. 1985) (quoting <u>Hobbs v. U.S. Atomic Energy Comm.</u>, 451 F.2d 849, 864 (5th Cir. 1971)). "One who simply provides the inventor with well-known principles or explains the state of the art without ever having 'a firm and definite idea' of the claimed combination as a whole does not qualify as a joint inventor." <u>Ethicon</u>, 135 F.3d at 1460. Since co-inventors do not need to make a contribution to the subject matter of every claim, inventorship is assessed on a claim-by-claim basis. <u>Trovan</u>, 299 F.3d at 1302.

Under an inventorship analysis, the first step is to construe each asserted claim "to determine the subject matter encompassed." <u>Id.</u> The second step is "to compare the alleged contributions of each asserted co-inventor with the subject matter of the properly

17cv87-GPC(MDD)

construed claim to then determine whether the correct inventors were named." Id. (citing Ethicon, 135 F.3d at 1462).

In this case, under the first step, on November 9, 2017, the Court conducted a claim construction hearing and construed the disputed terms of "a first drying stage" and a "second drying stage" of claim 1,step e and claim 1, step f of the '245 patent. (Dkt. Nos. 44, 61.) The Court construed "a first drying stage" as "a first stage to reduce the moisture content of the gel matrix without any foam formation" and "a second drying stage" to mean "a second stage to reduce the moisture content of the gel matrix without any foam formation." (Id. at 14.) The Court also construed the term "the temperature" as the "temperature of the gel matrix" as UST did not provide oppose or provide an alternate construction. (Id.) The Court will now consider the parties' arguments as it relates to the second step.

## C. Whether Dr. Bronshtein is a Co-Inventor Due to Lack of Collaboration

First, as a threshold issue, Defendant argues that UST has not provided any evidence that Dr. Bronshtein actually communicated the subject of the claims to either Dr. Harel or Ms. Kohavi-Beck sufficient to show collaboration under 35 U.S.C. § 256. Plaintiff disagrees.

Co-inventors need not "physically work together or at the same time," "make the same type or amount of contribution," or "make a contribution to the subject matter of every claim of the patent." 35 U.S.C. § 116. But to be a joint inventors under 35 U.S.C. § 116, "there must be some element of joint behavior, such as collaboration or working under common direction, one inventor seeing a relevant report and building upon it or hearing another's suggestion at a meeting." Kimberly Clark Corp. v. The Procter & Gamble Co., 973 F.2d 911, 917 (Fed. Cir. 1992). There must be "at least some quantum of collaboration or connection." Id. "The interplay between conception and collaboration requires that each co-inventor engage with the other co-inventors to contribute to a joint conception." Vanderbilt Univ. v. ICOS Corp., 601 F.3d 1297, 1303 (Fed. Cir. 2010). "Joint inventorship under section 116 can only arise when collaboration

or concerted effort occurs-that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts." Eli Lilly and Co. v. Aradigm Corp., 376 F.3d 1352, 1359 (Fed. Cir. 2004).

Dr. Bronshtein performed his work on behalf of ABN in California and Dr. Harel, Ms. Kohavi-Beck, and the rest of ABN's team performed their work in Maryland. (Dkt. No. 15-1, Bronshtein Decl. ¶¶ 3-4.) Both Dr. Bronshtein and Dr. Harel testified that they did not work directly with each other, (Dkt. No. 63-8, Blaszkowski Decl., Ex. E, Bronshtein Depo. at 103:23-104:4; 105:6-16; Dkt. No. 63-4, Blaszkowski Decl., Ex. A, Dr. Harel Depo. at 29:19-31:22). But numerous e-mails were exchanged between Dr. Bronshtein and the ABN team during the time period when the CDA was in effect concerning Dr. Bronshstein's work with ABN and Dr. Harel was included as one of the recipients. (Dkt. No. 93-1, Coddington Decl., Ex. 8 at 9-35, ABN0000796-ABN0000865 (UNDER SEAL).) Dr. Bronshtein also testified that Dr. Harel participated in many joint meetings where processes and other matters were disclosed. (Dkt. No. 63-8, Blaszkowski Decl., Ex. E, Bronshtein Depo at 105:6-16; Dkt. No. 72-6, Coddington Decl., Ex. 2, Bronshtein Depo. at 138:4-20; 139:4-140:2.) In addition, ABN's scientific notebook dated March 17, 2005 and witnessed and signed on March 18, 2005, states that "Victor was talking to Moti [Dr. Harel] . . . ." (Dkt. No. 93, Coddington Decl., Ex. 6, ABN-0001252 (UNDER SEAL).) In its statement of undisputed material fact no. 42, ABN states that "Dr. Harel instructed Dr. Bronshtein regarding the subject matter of claim 6." (Dkt. No. 63-2, D's SUMF, No. 42 at 10.) These facts create a genuine issue of material fact whether there was collaboration between Dr. Bronshtein and Dr. Harel.

However, Plaintiff has not addressed the lack of collaboration with Ms. Kohavi-Beck. Dr. Bronshtein testified he had "no clue" who Ms. Kohavi-Beck was. (Dkt. No. 63-8, Blaszkowki Decl., Ex. E, Bronshtein Depo. at 103:23-104:4; Dkt. No. 72-6, Coddington Decl., Ex. 2, Bronshtein Depo. at 140:3-9.) At the hearing, Plaintiff argued that collaboration between Dr. Bronshtein and Ms. Kohavi-Beck can be imputed based on the fact she worked under Dr. Harel. However, Plaintiff has not cited a case and the

Court has not found a case that has held that imputation can satisfy the collaboration requirement under 35 U.S.C. § 256 and § 116.

The Court need not make a ruling on this issue as the Court nonetheless GRANTS summary judgment in favor of Defendant as described below.

**D.    Whether Dr. Bronshtein is either a Co-Inventor or Sole Inventor**

UST argues it is clear from the record that Dr. Bronshtein is, at the very least, a joint inventor of the '245 patent.  First, Plaintiff argues that ABN admitted that Dr. Bronshtein contributed to the isomalt ratios described claim 1, step b of the '245 patent relying on a letter dated July 31, 2008 and email dated June 25, 2008 by Dr. William Kirk ("Dr. Kirk"), the CEO of ABN.  Defendant argues that these documents proposing a settlement offer are inadmissible under Federal Rule of Evidence 408.  Plaintiff replies that documents were not settlement communications because there was no offer of compromise.

██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████ (Dkt. No. 93-1, Coddington Decl.,

Ex. 8 at 7-8, ABN-0000771 to ABN-0000772 (UNDER SEAL).) ████████████████

████████████████████████████████████████████

████████████████ (Dkt. No. 95-1, Blaszkowski Decl., Ex. Q (UNDER SEAL).)

██████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████ (Id. (UNDER SEAL).)

Under Federal Rule of Evidence 408, evidence from settlement negotiations are inadmissible "either to prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a).  This includes "furnishing, promising or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or

attempting to compromise the claim." Id. It also includes any "conduct or a statement made during compromise negotiations about the claim." Id. But Rule 408 allows the use of statements from settlement negotiations for purposes unrelated to liability. Fed. R. Evid. 408(b). "Rule 408 is designed to ensure that parties may make offers during settlement negotiations without fear that those same offers will be used to establish liability should settlement efforts fail. When statements made during settlement are introduced for a purpose unrelated to liability, the policy underlying the Rule is not injured." Rhoades v. Avon Prods., Inc., 504 F.3d 1151, 1161-62 (9th Cir. 2007).

"Two principles underlie Rule 408:(1) '[t]he evidence [of compromise] is irrelevant, since the offer may be motivated by desire for peace rather than from any concession of weakness of position;' (2) '[a] more consistently impressive ground is promotion of the public policy favoring the compromise and settlement of disputes.'" Hudspeth v. C.I.R., 914 F.2d 1207, 1213-14 (9th Cir. 1990) (quoting Fed. R. Evid. 408 advisory committee's note). Rule 408 not only encompasses settlement offers but even "compromise negotiations" under Rule 408(a)(2). In re Gardens Reg'l Hosp. and Medical Ctr., Inc., Case No. 16-bk-17463-ER, 2017 WL 2889633, at *5 (C.D. Cal. July 6, 2017).

Here, Plaintiff seeks to admit the email and letter to demonstrate UST's inventorship claim, essentially to be used to show liability, and argues that they do not constitute settlement communication as they contain no compromise or concession. However, Rule 408 prohibits not just an offer of settlement but any preliminary settlement discussions. See id. at *5 (Rule 408(a)(2) includes any preliminary settlement discussions as the purpose of Rule 408 would be defeated and discourage settlement negotiations, "particularly in complex cases, because it is often necessary for parties to participate in multiple negotiating sessions before the parties are ready to begin exchanging formal settlement offers"). Because the email and letter attempt to resolve a disagreement between Dr. Bronshtein and ABN concerning the inventorship of the '245 patent, they fall under Rule 408's prohibition. Thus, Plaintiff's reliance on ABN's email

and July 31, 2008 letter to support its co-inventorship claim concerning isomalt ratios is misplaced as they are inadmissible under Rule 408.

Next, in response to ABN's argument that Dr. Bronshtein's theory of inventorship involving foam formation as construed by the Court is incompatible with the '245 patent, Plaintiff argues that foam formation is irrelevant to the Court's analysis because Dr. Bronshtein conceived other concepts of the '245 patent.  He claims he came up with the concepts concerning "trehalose to sugar alcohol/polyol (e.g., mannitol, glycerol, sorbitol, xylitol, maltitol, and lactitol) in ratios 3:1 and 2:1 as recited in step b) of claim 1 and claim 10; maintaining the temperature the harvested gel above the freezing temperature of water as recited in step d) of claim 1; a first drying state as recited in step e) of claim 1; a second drying stage as recited in step f) of claim 1; the pressure values and changes recited in claims 2, 4, and 5; and the time periods recited in claim 3."  (Dkt. No. 72-1, P's Opp. at 13-14.)  Furthermore, in order to show that he is the sole inventor of the '245 patent, he also argues that the remaining claims that he did not conceive were prior art or well known prior to the issuance of the '245 patent, and therefore, Dr. Harel and Ms. Kohavi-Beck cannot be the named inventors of the patent.

Since co-inventors do not need to make a contribution to the subject matter of every claim, inventorship is assessed on a claim-by-claim basis. Trovan, 299 F.3d at 1302.  In order to demonstrate Dr. Bronshtein was a co-inventor, UST must rebut the presumption that Dr. Harel and Ms. Kohavi-Beck are the true and only inventors by clear and convincing evidence that he contributed to the conception of some part of the invention. See Eli Lilly, 376 F.3d at 1358.  Further, in order to show that he is the sole inventor of the '245 patent, he must demonstrate, by clear and convincing evidence that the named inventors are misjoined. See id.  In a case of a misjoinder, "[t]he movants must also show that the persons to be removed did not contribute to the invention of any of the allowed claims." Univ. of Pittsburg of Commonwealth Sys. of Higher Educ. v. Hedrick, 573 F.3d 1290, 1297 (Fed. Cir. 2009).

### 1. Claim 1, step a - "dispersing under heating conditions at least one polysaccharide in water" – <u>Well Known</u>

In its motion, Defendant asserts that Dr. Harel's MicroMatrix technology, "which employs alginate (a polysaccharide) cross-linked in a Ca++ bath to encapsulate probiotic bacteria in a gel matrix" is key to the '245 patent and is described in claim 1, steps a, b and c. Defendant argues that its technology as described in steps a-c were provided to Dr. Bronshtein to conduct his research. (Dkt. Nos. 92-2 to 92-5, Blaszkowski Decl., Exs. I, J, K, L (UNDER SEAL).)

As to claim 1, step a, Plaintiff does not dispute that preparing the gel particles before drying was not Dr. Bronshtein's idea but argues that this process was well known and public domain knowledge. In support, UST solely cites to Dr. Harel's deposition where he allegedly admitted this fact. But Dr. Harel merely testified that claim 1, step a was performed in prior art but is not an invention on its own. (Dkt. No. 72-7, Coddington Decl., Ex. 3, Harel Depo. at 93:6-94:12.[2]) UST provides no legal support for its argument that a claim containing prior art is sufficient to establish misjoinder. <u>See</u> <u>Univ. of Pittsburg of Commonwealth Sys. of Higher Educ.</u>, 573 F.3d at 1297 ("The movants must also show that the persons to be removed did not contribute to the invention of any of the allowed claims."). Moreover, UST does not present evidence to create a genuine issue of material fact that Dr. Harel's statement constitutes clear and convincing evidence that he has been misjoined as an inventor.

### 2. Claim 1, Step b - "adding trehalose, a sugar alcohol and a probiotic bacteria to the dispersed polysaccharide to form a slurry, wherein the ratio of trehalose to sugar alcohol is 3:1 to 1:3 and wherein the sugar alcohol is selected from a group consisting of mannitol, glycerol, sorbitol, xylitol, maltitol, lactitol and isomalt" – <u>Dr. Bronshtein's Conception</u>

---

[2] The Court notes that the pages numbers in this deposition transcript are not chronologically numbered.

Defendant argues that claim 1, step b is part of its MicroMatrix technology "which employs alginate (a polysaccharide) cross-linked in a Ca++ bath to encapsulate probiotic bacteria in a gel matrix" and is fundamental to the '245 patent. (Dkt. No. 72-2, P's Response to D's SMUF No. 38; Dkt. No. 1-2, Compl. Ex. 1, '245 Patent, col. 6:18-19.) Plaintiff responds that the ratios of 2:1 and 3:1 claimed in step b were conceived by Dr. Bronshtein.[3]

Dr. Bronshtein testified that he followed ABN's MicroMatrix protocol to prepare the gel particles before drying because his role was to dry whatever formulations they provided. (Dkt. No. 63-11, Blaszkowski Decl., Ex. H, Dr. Bronshtein Depo. at 122:20-124:6.) He stated, "[t]o prepare gel particles before drying, I will use protocol that they requested from me. My service was to dry whatever formulations they ask me, I never pretend in this work that I design how to make particles for ABN. ABN make their way to make alginate particles . . . that is their product." (Id. at 123:1-9.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Dkt. No. 92-5, Blaskowski Decl., Ex. L (UNDER SEAL).) In addition, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Dkt. No. 86 at 4; Dkt. No. 92-4, Blaszkowski Decl., Ex. K (UNDER SEAL).) At the hearing, ABN acknowledged that the MicroMatrix protocol sent to Dr. Bronshtein did not include the 3:1 ratio formulation. However, the Court notes that ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[3] UST also argues that ABN admitted the isomalt ratios described in the '245 patent were provided by Dr. Bronshtein. It appears that UST is referencing the July 31, 2008 settlement letter which the Court concluded is inadmissible under Rule 408 and not supportive.

13

████████████, (Dkt. No. 92-4, Blaszkowski Decl., Ex. K at 3 (UNDER SEAL)), ████████
████████████████████████████████████████████

ABN also presents evidence that Dr. Bronshtein admitted at his deposition that the use of 2:1 trehalose/sucrose/saccharide to isomalt/polyol mixture was disclosed in prior art, (Dkt. No. 81-6, Blaszkowski Decl., Ex. P, Bronshtein Depo. at 132:9-133:20), and therefore he could not have contributed to the 2:1 ratio. See Eli Lilly, 376 F.3d at 1362 ("A contribution of information in the prior art cannot give rise to joint inventorship because it is not a contribution to conception.")

Finally, Dr. Harel testified that he had been working on utilizing composition of "polysaccharide saccharide and sugar alcohols" since 2003 and Ms. Kohavi-Beck enabled it further to the ratios that are presented in Claim 1, step b. (Dkt. No. 63-4, Blaszkowski Decl., Ex. A, Harel Depo at 95:3-17.) He explained that he conceived the percentage of composition in 2003 or early 2004 while the ratio, which is the process of the result, would not have been converted until the patent was written in 2005.[4] (Id. at 96:1-20.) This demonstrates the percentage of composition was created before ABN hired Dr. Bronshtein in June 2004.

UST claims that Dr. Bronshtein contributed the idea of using 3:1 and 2:1 ratios citing to his deposition testimony. In the cited testimony, Dr. Bronshtein states that he invented the 3:1 and 2:1 ratios of saccharide/sucrose to polyol/sugar alcohol in order to create the glass forming composition, but did not use 1:3 as that was not executable. (Dkt. No. 72-5, Coddington Decl., Ex. 1, Bronshtein Depo. at 118:1-19.[5]) Because Dr.

---

[4] ABN also argues Dr. Bronshtein admitted that the "3:1 to 1:3" ratio range will not work and specifically stating that using a 3:1 or 2:1 ratio of polyol to saccharide mixture will not cause the mixture to crystallize. (Dkt. No. 81-6, Blaszkowski Decl., Ex. P, Bronshtein Depo. at 114:21-115:3.) However, the Court notes that this portion of Dr. Bronshtein's testimony was referencing a 3:1 or 1:3 ratio of polyol to saccharide, and not the claimed saccharide to polyol ratio. ABN's citation to this portion of Dr. Bronshtein's deposition is not supportive.

[5] Again, the Court notes that the pages numbers in this deposition transcript are not chronologically numbered. Moreover, the quoted deposition testimony in Plaintiff's opposition is different than the actual deposition transcript. (Dkt. No. 72-1, P's Opp. at 18:14-17.)

17cv87-GPC(MDD)

Bronshtein testified that the 2:1 ratio was disclosed in prior art, the most he can claim is that he contributed to the 3:1 ratio. The Court questions whether the single ratio of 3:1 out of the four other alternative ratios from 3:1 to 1:3 constitutes a contribution that is significant in quality sufficient to support inventorship. See Acromed Corp., 253 F.3d at 1379; Massachusetts Eye and Ear Infirmary v. Novartis Ophthalmics, Inc., 199 Fed. App'x 960, 963 (Fed. Cir. 2006) (reversing district court where it failed to consider whether the named inventors had already conceived of broader range of 900mW/cm, and if so, then district court would have to consider whether the claimed narrower range is of any consequence for purposes of inventorship).

In support, UST also cites generally, without any page reference, to "*See* Ex. 8"[6] which includes 40 pages of emails, letters and scientific experiments, stating Dr. Bronshtein applied preservation solutions comprising disaccharides and polyols in ratios 3:1 and 2:1 to preserve probiotic bacteria in solutions comprising alginate in Ca++ cross linked form and presents a table with Experiment Nos. 21, 22, 24, 25, 27, 28-31 with the ratio of trehalose/polyol used. (Dkt. No. 72-1, P's Opp./XMSJ at 18-19.) First, all experiments are not contained in Exhibit 8 so the Court is unable to verify the ratios that

---

[6] Federal Rule of Civil Procedure 56(c) specifically requires a party asserting that a fact is in dispute or not in dispute must support that assertion by "citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c). The Court has no independent duty to search the plaintiff's materials for a triable issue of fact. See Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010) (courts have "no independent duty to scour the record" in search of genuine issues of fact); Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996); Southern California Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003) ("A party opposing summary judgment must direct our attention to specific, triable facts. General references without page or line numbers are not sufficiently specific"); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030–31 (9th Cir. 2001) ("A lawyer drafting an opposition to a summary judgment motion may easily show a judge, in the opposition, the evidence that the lawyer wants the judge to read. It is absurdly difficult for a judge to perform a search, unassisted by counsel, through the entire record, to look for such evidence . . ."). In many instance, UST cites generally to an exhibit and fails to provide specific page numbers to support its argument. While the Court has attempted to decipher and figure out what specifically Plaintiff is referencing, the Court declines to consider evidence where the Court is unable to make such a determination.

Plaintiff presents in the table.  Second, out of the nine experiments in the table, 3:1 is only used in 3 of the experiments.

After a careful review, it appears that Plaintiff may be referencing Experiment 27, conducted on April 11, 2005, using the ratios of 2:1 and 3:1 of trehalose/mannitol or trehalose/sorbitol.  (Dkt. No. 93-1, Coddington Decl., Ex. 8 at ABN-0000815-116(UNDER SEAL).)[7]  While Experiment 27 shows that Dr. Bronshtein used the 3:1 ratio, it does not demonstrate that the ratio was communicated as a new concept to ABN. Meanwhile, Plaintiff's citation to Experiments 28 and 29 to show that the 3:1 ratio was used is not supported by the record.

Under the "rule of reason", the Court considers the evidence as a "whole, not individually."  See Price, 988 F.2d at 1196.  The undisputed evidence presented demonstrates that the MicroMatrix technology was ABN's invention as testified to by Dr. Bronshtein and Dr. Harel's testimony that the percentages were created before Dr. Bronshtein's started working with ABN.  The only evidence UST provides that Dr. Bronshtein conceived of the 3:1 ratio is Experiment 27 cited in Exhibit 8 showing the use of these ratios, but does not demonstrate this was a new concept.  See Eli Lilly, 376 F.3d 1352 (alleged co-inventor did not demonstrate that the subject matter was communicated to the defendant's scientists).

Lastly, Plaintiff, in one sentence, states that "Polyols are also taught in Bronshtein 2004" which is prior art cited in the '245 patent.  UST provides no further explanation, legal support or even specific citation to the particular pages in this 22 page document containing dense scientific materials.  (See Dkt. No. 72-1, P's Opp. at 19; Dkt. No. 72-8, Coddington Decl., Ex. 4.)  The fact that polyols are taught in Bronshtein 2004 does not explain whether the ratio of "trehalose to sugar alcohol" in claim 1, step b was prior art.

---

[7] The Court notes that the ratio of 2:1 is used in Experiment 21, (Dkt. No. 93-1, Coddington Decl., Ex. 8 at ABN-0000820); however, since Dr. Bronshtein testified that the 2:1 ratio was used in prior art, he cannot claim inventorship of that ratio.

Thus, Plaintiff has failed to create a genuine issue of fact that he contributed to the 3:1 and 2:1 ratios of claim 1, step b.

### 3. Claim 1, step c - "contacting the slurry with a bath comprising Ca++ ions for a sufficient time to allow cross-linking thereby forming a gel matrix" – <u>Well Known</u>

As noted above, Defendant argues claim 1, step c is part of its MicroMatrix technology. Plaintiff does not dispute that Dr. Bronshtein did not contribute to the MicroMatrix aspect of claim 1 or claims 6 and 7, (<u>see</u> Dkt. No. 92-2, Blaszkowski Decl., Ex. I, UST-0000151; Ex. J, UST-0000638; Ex. K, UST-0000644-647 (UNDER SEAL); Dkt. No. 92-5, Blaszkowski Decl., Ex. L, UST 0001074 (UNDER SEAL); Dkt. No. 63-11, Blaszkowski Decl., Ex. H, Bronshtein Depo. at 122:24-123:9.) Instead, Plaintiff argues that many methods of alginate gel preparations existed before the '245 patent and is prior art; therefore, Dr. Harel and Ms. Kohavi-Beck cannot be deemed inventors of the '245 patent. As such, Dr. Bronshtein is the sole inventor. In support, UST cites solely to Dr. Bronshtein's deposition testimony where he asserts that crosslinking alginate is public domain knowledge. (Dkt. No. 63-8, Blaszkowski Decl., Ex. E, Bronshtein Depo. at 183:10-14; <u>see also</u> Dkt. No. 72-6, Coddington Decl., Ex. 2, Bronshtein Depo. at 71:11-23; 72:1-25; 73:1-12.) Responding, Defendant argues that UST has presented no evidence that ABN's technology of gel preparation methods is prior art. Moreover, ABN contends that Dr. Harel's MicroMatrix technology, also known as the "ABNC Technology" that employs alginate (a polysaccharide) cross-linked in a Ca++ bath to encapsulate probiotic bacteria in a gel matrix is key to the claims of the '245 patent which was acknowledged by UST in the CDA. (Dkt. No. 63-6, Blaszkowski Decl., Ex. C, CDA.)

Merely citing to Dr. Bronshtein's deposition testimony cannot constitute clear and convincing evidence of a misjoinder of inventors. <u>See</u> <u>Trovan</u>, 299 F.3d at 1302. Therefore, Plaintiff has failed to raise an issue of fact that claim 1, step c was not contributed by the current inventors sufficient to demonstrate misjoinder of inventors.

### 4. Claim 1, step d - "harvesting the gel matrix and placing the harvested gel matrix in a drier wherein the temperature of the harvested gel matrix is maintained above the freezing temperature of water" – <u>Dr. Bronshtein Conception</u>

Plaintiff asserts that many of Dr. Bronshtein's experiments harvested the gel matrix above the freezing temperature of water. Specifically UST claim "UST 21" provides a temperature chart showing the harvested gel was maintained above 0° C and cites generally to "Ex. 5" with no specific page number. Exhibit 5 are pages from Dr. Bronshtein's laboratory notebook during the time he worked with ABN.

ABN argues that Dr. Bronshtein's laboratory notebooks are unwitnessed and not reliable to support UST's position. Plaintiff argues that Dr. Vonsovich wrote and maintained all laboratory notebooks on behalf of Dr. Bronshtein during his work with ABN.

Under a rule of reason, a notebook entry that has not been "promptly witnessed does not necessarily disqualify it in serving as corroboration of conception." <u>Apator Miitors Aps v. Kamstrup A/S</u>, 887 F.3d 1293, 1297 (Fed. Cir. 2018) (quoting <u>Singh v. Brake</u>, 222 F.3d 1362, 1369 (Fed. Cir. 2000)); <u>Hybritech Inc. v. Monoclonal Antibodies, Inc.</u>, 802 F.2d 1367, 1378 (Fed. Cir. 1986) (where some of the notebooks were not witnessed until a few months to one year after their writing did not make them incredible or of little corroborative value). However, "an unwitnessed laboratory notebook, alone, cannot corroborate an inventor's testimony of conception." <u>Apator</u>, 887 F.3d at 1297 (citing <u>Brown v. Barbacid</u>, 276 F.3d 1327, 1335 (Fed. Cir. 2002) ("The Board did not err in holding that an inventor's own unwitnessed documentation does not corroborate an inventor's testimony about inventive facts."); <u>Procter & Gamble Co. v. Teva Pharms. USA, Inc.</u>, 566 F.3d 989, 998-99 (Fed. Cir. 2009) (laboratory notebook that "was unwitnessed and was not corroborated by any other evidence" could not corroborate inventor testimony of conception).

Here, Dr. Bronshtein states that his laboratory notebooks were written and maintained by his employee, Dr. Vonsovich, because he did not have time to write them. (Dkt. No. 63-11, Blaszkowitz Decl., Ex. H, Bronshtein Depo. at 79:19-80:10; Dkt. No. 63-8, Blaszkowtiz Decl., Ex. E, Bronshtein Depo. at 90:6-15.)  He testified that it is usually his practice to have his notebooks signed and witnessed but the protocols for ABN were not.  (Dkt. No. 63-11, Blaszkowitz Decl., Ex. H, Bronshtein Depo. at 30:15-21; 34-37.)  Instead, he testified that other scientists recorded the protocol.  (Id. at 37:3-10.)  Dr. Vonsovich states that he maintained all laboratory notebooks of Dr. Bronshtein during UST's work with ABN, specifically UST 20, 21, 29, 30.  (Dkt. No. 72-15, Vonsovich Decl. ¶ 3.)  He made daily detailed records of experiments.  (Id.)  His laboratory notebook entries were all confirmed by Dr. Bronshtein.  (Id.)  Dr. Bronshtein did not write protocols in notebooks because he was setting up equipment and other UST scientists executed the experiments according to his instructions.  (Id.)  During UST's work with ABN, he conducted the microbiological fermentation work.  (Id. ¶ 2.)  Specifically, he prepared preservation solutions, bacterial fermentation and bacterial activity testing.  (Id.)  Dr. Bronshtein testified during his deposition that he signed one notebook page, UST 1396 containing "inventive disclosure."  (Dkt. No. 63-11, Blaszkowitz Ex. F, Bronshtein Depo. at 87:10-20.)  However, neither party has cited to where UST 1396 is located and the Court is unable to locate it.

Here, Plaintiff has not demonstrated an issue of fact that Dr. Bronshtein's laboratory notebook pages concerning work he did for ABN were witnessed.  Defendant argues that the after-the-fact testimony of Dr. Vonsovich, Dr. Bronshtein's employee and an interested party, cannot be used to corroborate Dr. Bronshtein's claims.

Despite the parties' argument, the Court declines to make a ruling on this issue because even if the notebook pages constitute corroborating evidence, they are mostly illegible, difficult to decipher and no explanation is provided by Plaintiff or by an expert to explain the complex scientific content of the notebook.  The notebook includes numbers, letters, symbols with charts alongside cursive text that are difficult to read

discussing complex scientific processes. (See Dkt. No. 72-9, Coddington Decl., Ex. 5.) Even if Dr. Bronshtein's notebook was reliable, the Court is unable to obtain any evidentiary value from it.

At the hearing, Plaintiff directed the Court to the temperature chart from "UST 21" in the notebook to demonstrate that the temperature of the gel matrix is above the freezing temperature of water. (Dkt. No. 72-9, Coddington Decl., Ex. 5 at 4.) After a careful review, the Court notes that the chart has one line at around 30°[8] and one that goes across at around -40°. (Id.) It is not clear from the chart what the lines signify. The key to the chart explains the lines as "Shelf Temperature", "Temperature Probe Average", "Temperature Reference (shelf)," "Vacuum" and "Vacuum Reference." (Id.) It is not clear which line references what and there is no line for "temperature of the gel matrix." The Court notes that claim 1, step d refers to the "temperature of the harvested gel matrix is maintained above the freezing temperature of water", not the temperature of the shelf temperature as indicated on the chart. Without expert testimony, the Court is unable to conclude that the chart supports Plaintiff's position.

ABN also cites to Dr. Bronshtein's testimony that his proposed drying protocol involve partial freezing where the temperature of the product is maintained at below the freezing temperature of water and the material is partially frozen. (Dkt. No. 63-8, Blaszkowski Dec., Ex. E, Dr. Bronshtein Depo. at 214:18-24.) Here, step d provides that the "temperature of the harvested gel matrix is maintained above the freezing temperature of water" which is contrary to Dr. Bronshtein's proposed drying protocol. Thus, Plaintiff has not raised an issue of fact that Dr. Bronshtein conceived of claim 1 step d.

////

////

////

---

[8] The chart does not indicate but the Court assumes the temperature are in Celsius.

**5.** **Claim 1, step e - "reducing the pressure during a first drying stage and maintaining the temperature at about 10-20° C. for a first period of time;" – <u>Dr. Bronshtein Conception</u>**

Defendant argues that Dr. Bronshtein could not have conceived of this claim because all his experiments involved foam formation and based on the Court's claim construction, step e does not involve any foam formation. In response, Plaintiff argues that Dr. Bronshtein process does not create foam. (Dkt. No. 72-1, P's Opp. at 20.)

However, UST's argument is disputed by Dr. Bronshtein's own testimony. Dr. Bronshtein testified that all his processes and patents involve foam formation. (Dkt. No. 63-11, Blaszkowski Decl., Ex. H, Dr. Bronshtein Depo. at 126:13-17; Dkt. No. 81-3, Blaszkowski Decl., Ex. M, Dr. Bronshtein Depo. at 77:1-3.) In addition, boiling is an important part of all his technologies and foaming always occurs with boiling. (Dkt. No. 63-8, Blaszkowski Decl., Ex. E, Dr. Bronshtein Depo. at 22:18-19; 35:2-10.) Because the Court construed the "first drying stage" and the "second drying stage" as reducing "the moisture content of the gel matrix without any foam formation", (Dkt. No. 61 at 14), Plaintiff's argument is without merit and has not created a genuine issue of material fact that Dr. Bronshtein conceived of step e.

In its opposition and motion, Plaintiff additionally argues that step e was conceived by Dr. Bronshtein because the claim tracks Example 1 in the '245 patent. In support, Plaintiff cites to deposition transcripts of Dr. Harel and Dr. Bronshtein; however, neither deposition transcript pages are in the record. UST also cites to Exhibit 5, Dr. Bronshtein's notebook concerning Experiments 21, 22, 24, 25, and 27-32. As discussed in detail above, Exhibit 5 is not reliable evidence.

Lastly, UST claims that Dr. Bronshtein explicitly suggested this step to ABN when he emailed a proposed drying protocol on June 20, 2005, ████████████████████ ████████████████████████████████████████████████ (<u>See</u> Dkt. No. 93-1, Coddington Decl., Ex. 8, ABN-0000586 (UNDER SEAL).) On this argument, ABN contends that the Court's claim construction construed "temperature" as

"the temperature of the gel matrix" and not the "shelf" or the ambient temperature referenced in the drying protocol. (See Dkt. No. 61 at 14.)

█████████████████████████████████████████████████████████████

███████████████████████, (Dkt. No. 93-1, Coddington Decl., Ex. 8, ABN-0000586 (UNDER SEAL)), which appears to track the language of step e. However, the Court construed "the temperature" to be "the temperature of the gel matrix" and not the "temperature of the shelf" creating a distinction between the two processes. (Dkt. No. 61 at 14.) In reply, UST generally argues that "the temperature of the gel matrix necessarily tracks the temperature of the shelf that it sits on" and is simply "basic cooking/baking – the substance cooked will reach the temperature of the environment it is cooked in, ie., the oven, within a period of time." (Dkt. No. 90 at 5.) UST does not provide any expert evidence to support its argument.

After a careful review of Dr. Bronshtein's drying protocol, and the patent claims, the Court notes that Dr. Bronshtein's proposed drying protocol distinguishes between the "temperature of the shelf" and the temperature of the "material." While Dr. Bronshtein's drying protocol references ███████████████████████████████████████████, Dr. Bronshtein writes, the ███████████████████████." Dr. Bronshtein distinguishes between the shelf temperature and the temperature of the "material" or "gel matrix." Furthermore, Dr. Bronshtein testified that step 4 of his drying protocol, "[w]hen the temperature of the shelf reaches 20° C apply complete vacuum" was incorrectly written and should be rewritten as "when temperature of the sample is 20 degrees, apply complete vacuum."[9] (Dkt. No. 63-8, Blaszkowski Decl., Ex. E, Dr. Bronshtein Depo. at 220:18-221:14.) Lastly, Dr. Bronshtein testified that he does not believe that claim 1 is

---

[9]While Dr. Bronshtein's testimony that the corrected step 4 of his drying protocol appears to track the language in step e, the testimony from the alleged inventor, by itself, is not sufficient to demonstrate clear and convincing evidence. See Hess, 106 F.3d at 980.

referring to the temperature of the sample and that is why he believes the temperatures claimed is his process and that the claim accurately describes the shelf temperature and not the product temperature. (Dkt. No. 63-11, Blaszkowski Decl., Ex. H., Dr. Bronshtein Depo. at 53:8-11.) Therefore, UST's argument that the temperature of the material will necessarily track the temperature of the shelf is not supported.

The Court also notes that Dr. Harel testified that the protocol in the '245 patent is different than Dr. Bronshtein's proposed drying protocol in the email dated June 20, 2005. (Dkt. No. 90, Coddington Decl., Ex. 11, Harel Depo. at 142:4-144:13.) He stated the drying protocol in the email dated June 20, 2005 is not utilized in the patent. (Id. at 144:8-13.)

Therefore, UST has not presented a genuine issue of material fact that it can prove by clear and convincing evidence that Dr. Bronshtein contributed to the drying protocol as it relates to the temperature range in step e.

**6.      Claim 1, step f - "further reducing the pressure during a second drying stage and increasing the temperature to between about 40-50° C. for a second period of time to produce the glass matrix comprising the probiotic bacteria." – <u>Dr. Bronshtein's Conception</u>**

Similar to the argument presented for step e, Plaintiff claims this language tracks Example 1 in the '245 patent and cites to deposition transcripts of Dr. Harel and Dr. Bronshtein that are not in the record and cite generally to an unexplained and mostly illegible laboratory notebook of Dr. Bronshtein. However, Dr. Harel testified that he conceived of Example 1, which is undisputed based on UST's lack of presenting any reliable and admissible evidence on the issue. (Dkt. No. 90-2, Coddington Decl., Ex. 11, Dr. Harel Depo. at 130:10-25.)

Finally, UST argues that Dr. Bronshtein's proposed drying protocol, (Dkt. No. 93-1, Coddington Decl., Ex. 8 at ABN-0000586 (UNDER SEAL)) states ███████████ ███████████████████████████████████████████" which appears to track step f as the temperature is increased to "between about 40-50º C. As explained above in

step e, the temperature referenced in the patent is the temperature of the gel matrix, not the shelf temperature.  As construed, step e of the '245 patent references that the temperature of the gel matrix at the second period of time will be between 40-50º C, while Dr. Bronshtein's proposed drying protocol ████████████████████ ████████████████████████████████████████.  The temperature of the material of 30-35º C is different than the 40-50º C temperature range provided in the patent.  Thus, Plaintiff has not presented a genuine issue of material fact that it can prove by clear and convincing evidence that Dr. Bronshtein contributed to the drying protocol as it relates to the temperature range in step f.

7. **Dependent Claim 2 – "The process according to claim 1, wherein the pressure during the first stage is reduced to about 2,500 mTOR and the pressure at the second stage is maintained less that 100 mTOR."– <u>Dr. Bronshtein's Conception</u>**

**Dependent Claim 3 – "The process according to claim 1, wherein the first drying stage is from 12 to 16 hours and the second drying stage is from 12 to 48 hours." – <u>Dr. Bronshtein's Conception</u>**

**Dependent Claim 4 – "The process according to claim 1, wherein pressure during the first stage is slowly reduced in increments to the lower pressure of the second drying stage." – <u>Dr. Bronshtein's Conception</u>**

**Dependent Claim 5 – "The process according to claim 4, wherein the reduction in pressure is in increments of 125 mTOR/hr." – <u>Dr. Bronshtein's Conception</u>**

UST also summarily argues that claims 2, 3, 4, and 5 were conceived by Dr. Bronshtein and cites solely to Exhibit 5, Dr. Bronshtein's illegible and unexplained notebook, which the Court concludes is not reliable, and Exhibit 8, a forty page document consisting of different documents, with no specific citation.

Specifically, on dependent claim 2, UST argues that UST Experiment 30 in Exhibit 8 provides a pressure chart that fulfills claim 2.  However, no citation is provided for

Experiment 30.   However, after the Court's review, it appears that UST may be referencing the drying protocol presented by Dr. Bronshtein to ABN on June 20, 2005. (Dkt. No. 93-1, Coddington Decl., Ex. 8, ABN-0000586 (UNDER SEAL).)  Dr. Bronshtein writes, ████████████████████ (Id.)  After the shelf temperature is altered, the drying protocol states, then ████████████ (Id.) Plaintiff, without any scientific or evidentiary support, states that applying vacuum of 1 Torr for 30 minutes reduces the pressure to about 2.5 Torr and a complete vacuum is less than 100mTor.  Therefore, UST claims Dr. Bronshtein's proposed drying protocol is contained in claim 2.  Without any scientific support or request for judicial notice that applying vacuum of 1 Torr for 30 minutes reduces the pressure to about 2.5 Torr and a complete vacuum is less than 100mTorr are conclusions that are "readily determined from sources whose accuracy cannot reasonably be questions," Fed. R. Evid. 201(b)(2), the Court cannot conclude that UST has presented evidence to create a genuine issue of fact that Dr. Bronshtein conceived the process in dependent claim 2.

On dependent claim 3, the citation to Exhibit 5, Dr. Bronshtein's notebook, is not supportive as there is no expert testimony or explanation.  Moreover, the drying protocol proposed by Dr. Bronshtein on June 20, 2005 of ████████████ suggested a second drying stage of 24 hours.  (Dkt. No. 93-1, Coddington Decl., Ex. 8, ABN-0000586 (UNDER SEAL).)  However, dependent claim 3 states the "first drying stage is from 12 to 16 hours" and "the second drying stage is from 12 to 48 hours." Plaintiff has not demonstrated an issue of fact that Dr. Bronshtein conceived of the temperature range in dependent claim 3.

The argument that Dr. Bronshtein conceived of dependent claims 4 and 5 is also not supported by any reliable evidence.  Plaintiff cites to UST Experiments 21, 22, 24, 26, and 27-32 in Dr. Bronshtein's indecipherable notebook, Exhibit 5, which the Court concluded was not reliable.  Plaintiff has not met its burden on summary judgment.

/ / / /

/ / / /

**8.** **Dependent Claim 6** – "**The process according to claim 1, wherein contacting the slurry of step c) comprises extruding the slurry into the Ca++ ion containing bath and forming matrix strings that crosslink while retained in the bath.**" – <u>**Well-Known**</u>

**Dependent Claim 7** – "**The process according to claim 1, wherein the gel matrix of step c) is sliced to form threads before placement in the drier.**"– <u>**Well-Known**</u>

**Dependent Claim 8** –"**The process according to claim 1, wherein the probiotic bacteria is selected from the group consisting of Lactobacillus, Bifodobacterium, Enterococcus, Proionobacterium, Bacillus and Streptococcus, wherein said probiotic bacteria is live.**" – <u>**Well-Known**</u>

Plaintiff contends that dependent claims 6, 7, and 8 were well known from prior art and cite again to Dr. Bronshtein's deposition transcript.  (<u>See</u> Dkt. No. 72-1, P's Opp at 21-22.)  First, an inventor's testimony, by itself, does not constitute clear and convincing evidence to rebut the presumption that the inventors on an issued patent are the true and only inventors as to dependent claims 6, 7, and 8.  <u>See</u> <u>Hess</u>, 106 F.3d at 980. Furthermore, the cited depositions transcript as well as the citation to Dr. Bronshtein's notebook to support dependent claims 6, 7, and 8 are not even in the record.  Lastly, as to claim 8, UST merely states "Lactobactillus and Streptococcus are taught in Bronshtein 2004" and "Lactobacillus, acidolphilus and Bifodobacterium are taught in Sultana." (Dkt. No. 72-8, Coddington Decl., Ex. 4; Dkt. No. 72-16, P's RJN, Ex. A[10].)  UST provides no specific page number or explanation how the claims were taught in these documents.  The Sultana article is entitled "Encapsulation of probiotic bacteria with

---

[10] Plaintiff filed a request for judicial notice of an article entitled "Encapsulation of probiotic bacteria with alginate-starch and evaluation of survival in simulated gastrointestinal conditions and in yogurt," Sultana et al., International Journal of Food Microbiology 62 (2000).  (Dkt. No. 72-16, P's RJN, Ex. A.) Defendant does not oppose.  Federal Rule of Evidence 201 provides for judicial notice of documents "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  The Court concludes that the article may be judicially notice and grants Plaintiff's request for judicial notice.

alginate-starch and evaluation of survival in simulated gastrointestinal conditions and in yoghurt." (Dkt. No. 72-16, P's RJN, Ex. A). The Court is unable without explanation to make a determination that these documents were well known and UST provides no legal authority that even if claims 6, 7, and 8 were well known, that would rebut the presumption that Dr. Harel and Ms. Kohavi-Beck are the true inventors. Thus, UST has failed to demonstrate its initial burden on summary judgment that Dr. Harel and Ms. Kohavi-Beck are not the true inventors of the '245 patent because these claims were well known prior art.

9. **Dependent Claim 9 - "The process according to claim 1, wherein the polysaccharide is selected from the group consisting of starch, a non-digestible starch, pectin, inulin, xanthan gum, alginate, alginic acid, chitosan, carrageenan, carboxymethyl cellulose, methyl cellulose, guar gum, gum arabic, locust bean gum and combinations thereof." – Well Known**

Plaintiff argues that Dr. Harel testified that the use of the polysaccharides, like those listed in claim 9, was recognized in prior art. However, Plaintiff misconstrues Dr. Harel's testimony. Dr. Harel was asked whether the first step had been performed in the prior art, not whether he used the polysaccharides listed in claim 9. (See Dkt. No. 72-7, Coddington Decl., Ex. 3, Dr. Harel Depo. at 93:6-94:12.) Therefore, Plaintiff's argument is not supported by Dr. Harel's deposition and does not constitute corroborative evidence.

10. **Dependent Claim 10 - "The process according to claim 1, wherein the ratio of trehalose to the polyol is about 3:1." - Dr. Bronshtein's Conception**

Plaintiffs argues that Dr. Bronshtein conceived dependent claim 10 similar to claim 1, step b. Plaintiff again cites to his deposition testimony, which is not sufficient by itself to demonstrate clear and convincing evidence of correcting inventorship, and his publication Bronshtein 2004 which the Court concluded was not sufficiently explained to create a genuine issue of fact. Plaintiff also cites to Exhibit 5, the unexplained laboratory notebook, and Bronshtein's alleged testimony of certain experiments in the notebook.

However, the citation to his deposition testimony is not in the record. Nonetheless, an inventor's testimony alone cannot constitute clear and convincing evidence to support correction of inventorship. See Hess, 106 F.3d at 980. Furthermore, the Court concluded above on claim 1, step b that Plaintiff had not raised an issue of fact that Dr. Bronshtein conceived of the 3:1 ratio. Accordingly, Plaintiff has not raised an issue of fact that there is any corroborating evidence that Dr. Bronshtein conceived the process in claim 10.

**E.    Unjust Enrichment and Constructive Trust and Accounting**

Defendant moves for summary judgment on the unjust enrichment claim and constructive trust and accounting. Plaintiff opposes and cross-moves for summary judgment. Because the Court grants Defendant's motion for summary judgment on the correction of inventorship cause of action, the Court also GRANTS Defendant's motion for summary judgment and DENIES Plaintiff's motion for summary judgment the unjust enrichment and constructive trust and accounting claims as they are based on facts supporting the correction of inventorship claim.

**Conclusion**

For the reasons stated above, the Court GRANTS Defendant's motion for summary judgment on all claims and DENIES Plaintiff's cross-motion for summary judgment. The Clerk of Court shall issue judgment accordingly and close the case.

IT IS SO ORDERED.

Dated:  August 21, 2018

Hon. Gonzalo P. Curiel
United States District Judge